Okay, we will call the next case, number 18-11114, Texas Capital Bank v. Daniel Zeidman. Mr. Provost, why don't we, hold on one sec, just let, let's look. Good morning. Good morning, Judge Clement, Judge Duncan, Judge Oldham. May it please the Court. We are here this morning on an issue that could briefly be summed up as this. Under Texas law, can a co-guarantor of a promissory note pay off early and obtain a discharge or a release of the guarantor's guarantee agreement? And there's an added wrinkle in this case, which is under the guarantee agreement, the guarantee agreement contained language that said a modification, a subsequent modification of this guarantee agreement must be in writing. And the trial court erred by refusing to accept the defendant in the case, Mr. Zeidman's, evidence in support of his defenses to the guarantee agreement based on the release, saying that that language in the guarantee agreement that barred any subsequent modification that wasn't in writing, that it barred this evidence. And the district or the trial court did not specify that it was barred by the parole evidence rule or by the statute of frauds, but the appellee has raised that in their briefing. Texas law, I think, is absolutely clear that a debtor can obtain a discharge or a release of a debt orally by an oral agreement. What's the best case for that proposition under Texas law? Your Honor, the best case is the Dicker v. Lomas case. And in that case, the guarantor was released orally for helping sell a piece of property that was actually foreclosed on under the deed of trust that was a package with the promissory note. But in addition, Your Honor, the Texas Supreme Court, and I did not cite this, but the appellee has cited the Texas Supreme Court case of Jenkins v. Henry C. Beck. It's a 1969 Texas Supreme Court case in which the Texas Supreme Court absolutely says, yes, an obligor can always obtain a discharge or a release of a debt from a creditor by an oral agreement. Now, I think that there are several things that are clear in the case. The first is that Mr. Zeidman was not attempting to obtain orally a modification of the guarantee agreement. For instance, guarantee agreement says Texas law will apply. He was not attempting to go and get a modification that says, no, wait, Oregon law will apply. But under the terms of the written agreement, if Mr. Zeidman paid X, he'd still be on the hook for the rest, right? That wouldn't automatically get him off the hook. I'm sorry, Your Honor, I didn't know that. Well, so under the terms of the agreement, he and the other guy were co-guarantors for the entire amount, $1.3 million. Yes. Okay, so here's what I don't understand. He pays the amount. He says, well, they agreed to just release me. From his guarantee. From his guarantee. Why doesn't that modify the written agreement? Because it's a subsequent agreement as to payment, and it's additional consideration for that subsequent agreement. It's not an agreement to modify the guarantee. The guarantee is still there. Mr. Zeidman says, I see my guarantee. I recognize my obligation in the event of a default under the note. But what I'd like to do, creditor, is I'd like to go ahead and get my guarantee released so I can move on down the road. You've still got the note. You've still got your security agreement. You've still got a co-guarantor. But I'd like a release of my guarantee, so I want to enter into a new agreement, a subsequent agreement, subsequent to the guarantee to obtain my release from my guarantee alone. And so he's not seeking a modification of that existing prior guarantee. He's entering into a new agreement, or he's obtaining a release. And as I say, there are a number of theories under Texas law where he can have the defense to the enforcement of that guarantee agreement once he made that payment. Right, so, I mean, we're here on grant of summary judgment, and your point is that the affidavit shows a genuine issue of material fact as to a number of defenses. Yes. So why don't you walk me through each one of those and tell me why there's a genuine issue of material fact created by the affidavit. I guess, what's the first one? Yes, Your Honor. Quasi-estoppel? I've led with quasi-estoppel. And the reason I led with quasi-estoppel, by the way, is that the other theories, which would be a release or an accord in satisfaction, the case law both say that those are relying on a subsequent agreement. And so an agreement, a contract. It was oral, but that would require an offer, acceptance, meeting the minds as to the terms, and performance of the contract. And so if this court were not to look at Mr. Zyman's affidavit and say, well, you know, we know that he made an offer. He wanted to pay $500,000. We know that there was an acceptance of that offer by saying, yes, we'll release you. But there is no evidence in the record that TCB did say, other than Mr. Zyman, creating that fact issue in his affidavit, saying that, yes, they said they would accept it. But it appeared to me that the easier thing for the court to deal with is on quasi-estoppel, because quasi-estoppel is an equitable doctrine that says that it precludes a party from asserting to another person's disadvantage a right that's inconsistent with a position that was previously taken. And so in this case, you have Texas Capital Bank taking the position that, yes, please pay us this $500,000 that you have no obligation to pay right now. We want that money, that lump sum up front from you, and in exchange we'll go ahead and give you your release. And then later down the road, after there's a default by the obligor on the note and after the bank is trying to collect from the co-guarantor and they realize that they're having trouble doing that, then the bank looks up and says, oh, wait, you know, we do have this other guarantee. We know we released it, but, you know, let's go take this position that the guarantee was not released. And so Mr. Zeidman's affidavit creates a fact issue because Mr. Zeidman tells the story. He says, I looked up. I realized I don't want to be in this deal anymore. I realized I was going to be making payments over a three- or four-year time period and contributing money on monthly payments. I didn't want to do that. I knew that my portion of the guarantee, even though it is an unlimited guarantee, is $500,000. I want to buy myself out of it. And so in his affidavit he says he made the phone call to the bank officer who had the loan. He said, I'd like out of my guarantee. My obligation with my business partner is $500,000. Will you take it? And the bank officer, Kirk Gibson, says, sure. Wire transfer the money and you're releasing your guarantee. What do we make of the email that the loan officer sent after the $500,000 that says, okay, well, we acknowledge the receipt. You've paid it down, $500,000, as originally underwritten. Here are the terms. Here's the amortization schedule, et cetera. And then the last sentence is, we could amortize the 818 over 48 months if you guys, the two guarantors, would like it. It seems to be inconsistent with the idea that Zeidman gets to just walk away. That's an excellent question, Judge. And at first I tortured over that. And in the appendix to the appellant's brief at tab five on record excerpts is the actual promissory note. And if you look at the signature page of the promissory note, Mr. Zeidman signed as manager of Gallery Internet LLC. Now, what's interesting is Mr. Zeidman's affidavit, he testified to the fact that he had already essentially split sheets with his partner at that point and was no longer in any operational capacity. He just wasn't involved in the business. But he was still an officer of the LLC. He never responded to Kirk's email. I'm sorry, Your Honor? He never responded to Kirk's email. That is correct. He did not respond. In the record, he didn't respond. His testimony is that he had been released. I believe, to get back, and I'm sorry if I didn't answer your question, but to get back to Judge Oldham's question, which is that the email is being sent by Mr. Gibson to both because they're both officers, and so he's writing the email to the officers of the obligor on the note, which is Gallery Internet LLC, saying, okay, now that we've gotten this lump sum payment from a guarantor, he doesn't mention that it's a release of the guarantee, but he's not addressing the issue of a guarantee. He's just writing it to the officers of the maker of the note. And what's also interesting about that email is that he's, Mr. Kirk is, I'm sorry, Mr. Gibson is recognizing that the payment under this note that was executed June of 2016, and in the note it says the monthly payment will be $27,000 and some change. He says, based on the new principal balance, the new payment will be $17,000 and some change. And what's interesting is that in itself is a modification of the note. In other words, the note does not say that it's a $17,000 monthly payment. And so what I believe, to kind of close the circle to your question, what I believe that email is recognizing is that the bank would like to and is willing to reamortize, if you will, the monthly payments given the payoff by Mr. Zeidman of his guarantee and the lump sum that credited against the principal of the note, and he's writing that to both of the officers of the maker of the note. Well, it kind of looks like, I mean, it doesn't actually say we're modifying the note. It purports to say if we do it this way, like we can, it's an invitation to the two officers and the two guarantors to say we have the $500,000. Now, what should we do with it? Here's an idea. If we do it this way, then the monthly payment goes down and everything will keep the amortization schedule the same. But it seems to be consistent with the idea that – I should put it differently. It seems to be inconsistent with the idea that there was an oral agreement prior that we were going to accept the $500,000 as consideration to let Zeidman walk free. And, Your Honor, I think that it is an interesting email. I don't think it's inconsistent, though, because the guarantee and the note are just two separate documents in a loan transaction. And so as a bank officer, if you've reached an agreement and you've cut one of the guarantors loose on a release, then you're just dealing with the note and the obligation under the note that you're still dealing with. And, in fact, you're not even dealing with the other guarantor at that point as a guarantor because the note's not in default. This is shortly after a new renewal and extension of the note. Those guarantee obligations don't trigger and become liquid and non-contingent until there's a default on the promissory note. Back to quasi-estoppel. I have here from the Lopez case from Texas Supreme Court the proposition that the doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced or from which he accepted a benefit. Now, I understand your argument is that the affidavit shows that Gibson, the bank representative, had one position on release and then had an inconsistent position, and that's sort of the ground of your quasi-estoppel claim. But why would it be unconscionable given that Mr. Zeidman already owed not just the $500,000 he paid but the entire amount? That's an excellent question, Your Honor, and it gets to kind of the heart of the issue on a guarantee and the consideration for this subsequent agreement. Mr. Zeidman didn't owe any money at that point in time that he paid, the $500,000. And in the real world, from a bank's perspective, just having a guarantee as opposed to having money are two very different things. And so to have a guarantee, it's an additional security. It makes it more secure just like a security agreement or a deed of trust. It's something to fall back on if there's a default on the promissory note. But it's not real money until it's real money, and they can't even call the guarantee until the loan defaults, and so they don't really know what the guarantor is really going to have until that day comes. I see. So you would say then the benefit, and I don't mean to put words in your mouth, but you'd say the benefit is that they got the money. Exactly. They got the $500,000. That's right, and that's golden to a bank because it's a bird in a hand, right? Okay. You want to tell us real quick about the other? That was quasi-estoppel. What about equitable estoppel? Yeah, sure. Equitable estoppel has essentially five elements. It requires that it would have required that the bank or the bank officer made a false representation or concealed material information and that that bank officer had actual or constructive knowledge of the facts that he was representing at the time that he was making them with the intent that they be acted on by this party, Mr. Zeidman, and that Mr. Zeidman lacked that knowledge, lacked the ability to discover that knowledge, and that Mr. Zeidman relied on it to his prejudice. Where's the detriment and reliance? Detriment and reliance is he sent his money. He had $500,000 in one of his holding entities, Kush LP, and he devoted that $500,000, which he did not have any obligation to pay at that time, to the bank. So the false representation, of course, Mr. Zeidman says in his affidavit that this was a representation made that they would release him. Now, I don't know until I would depose or have Mr. Gibson on the stand whether or not that's false. You're just saying it's a fact issue. Fact issue. That's exactly right. Next is I'll skip release and go to accord and satisfaction, and accord and satisfaction is a relatively simple concept. The accord is where there's an agreement where one party agrees to accept something other than what she is entitled to, and then the satisfaction is the performance of the agreement. So it's quite simple. The creditor looks up and says, okay, we know we're entitled to hold your guarantee and wait to see if there's a default and hold you as an individual to make the difference if we can't get it from the obligor on the note. But, you know what, we'll release that obligation to you if you'll give us cash right now. And so it's a discounted cash payment to get something on that guarantee right now in the bank's pocket. And the satisfaction was the performance of the agreement by Mr. Zyman. And so Mr. Zyman says that this was the deal. He says he made the phone call. So there's a question of fact on that. And then lastly is release, which is very similar to an accord and satisfaction, which is they knew that they had a legal right to enforce a guarantee. They knew that Mr. Zyman owed that obligation, and they agreed to release it when he paid the $500,000. Any consideration? And the consideration is the new consideration, which is his payment. There are cases, Texas cases, distinguish where if, here's the distinction, had Gallery Internet actually defaulted and the guarantee agreements were triggered and if the bank would have made a demand on Mr. Zyman and there had been no prior deal between the two for a release, and the bank made a demand on Mr. Zyman, and Mr. Zyman popped up and said, well, I'm going to go ahead and make a $500,000 payment to you. No consideration? I think the case law would say that's not consideration because now you owe the whole amount. And so by making this partial payment, you're not giving new consideration because you owe it. But here you think there is consideration because? That's right, Judge, because at this time he didn't owe that amount at all, and so his subsequent agreement is supported by the new consideration of payment of $500,000. I'm seeing my time is up. No problem. I understand. You'll have rebuttal. Thank you very much. Thank you. Let's see. Mr. Field. Good morning. May it please the Court. My name is Brett Field, and I represent the interests of the Appellate Texas Capital Bank. There's really two issues that I'll be addressing with the Court today. The first is whether there was a valid contract modification between Mr. Zyman and the bank, and the second issue is whether the trial court properly granted summary judgment and denied the affirmative defenses. Appellant's first point of error is that there was no valid contract modification between the parties for several reasons. First, Appellant's sole evidence in this case is based on this alleged oral agreement between the bank and himself, and that agreement is not admissible for multiple reasons. Number one, the contract documents themselves that Mr. Zyman signed with the bank prohibited these very types of oral modifications to the agreements. Now, is it Texas law that, notwithstanding that language, there could be an oral modification, or is Texas law different? Well, in order to – that sort of leads into my next point, which is that Texas law has taken the statute of frauds and codified it in the Texas Business and Commerce Code. And in this case, the Texas Business and Commerce Code specifically applies under Section 26.02B because it involves a loan of over $50,000 from a financial institution, and in 26.01B2 where it then applies that to personal guarantees. And so in – So those two sections mean that the guarantee, the loan agreement and the guarantee, are subject to the statute of frauds. That's correct. And so in his attempt to circumvent the statute of frauds, the appellant has cited this case to Marlon Industries v. Nelson. And in that case, the court stated – this was an El Paso Court of Appeals case – it stated a written contract not required by law to be in writing may be modified by a subsequent oral agreement even though it provides that it can be modified only by a written agreement. That sounds like a distinction, but I asked him what his best case was, and he said Dicker. Correct. And there's that case? And the Dicker case – the Dicker case involved multiple conversations between the borrowers in that case and the lender in that case. And there was subsequent – there was subsequent conduct by the parties to – that's ratified those oral agreements. And basically it was a – Was it a guarantee? It was a – According to orally modified? It was a covenant not to sue that was involved in that case. Was it subject to the statute of frauds? It was subject to the statute of frauds, but what the court stated in that case is multiple conversations followed by subsequent conduct to support it may take a contract out of the purview of the statute of frauds, but that is not what we have in this case. We have one conversation between the bank and Mr. Zeidman, one alleged conversation, and the only objective evidence that the court has to look at is the e-mail that's in the – that was referenced that was sent to the parties and said this is – we've applied the loan – we've applied the payment. This is the new loan balance. We have these options for future payments. And there was never a response from Mr. Zeidman. Is there a distinction between Dicker, in this case the quantum of proof, to show the subsequent agreement or something else? No. In this case, it is – the distinction is that quantum of proof. There was no disagreement in that case about the discussions that were had and the conduct that took place afterwards, which is – But we're here on summary judgment, right? Correct. There's a fact issue. Don't we have to reverse? But respectfully, there is no fact issue in this case because the trial court correctly determined that this oral agreement in and of itself is not admissible. And it's also not admissible the – we talked about the statute of frauds. We talked about the agreement. But as the Dallas Court of Appeals stated in Blackstone v. Phoenix Surgicals, a valid contract modification must include a meeting of the minds supported by new consideration. So if we break those two elements out, the Dallas Court of Appeals and Siddiqi said that meeting of the minds has to be an objective meeting of the minds, not a subjective meeting of the minds. And again, we come back to the only objective evidence that we have in this case is that email that was sent from the bank to Mr. Zeidman to which there was no response. Is the position of the bank that the affidavit that Mr. Zeidman submitted is perjured? Is the position of the bank that the things that Mr. Zeidman says were said on the phone call just were not said? Well, there's no evidence that was admitted into the case, but effectively, yes. The bank denies that there was an agreement between the parties. But the bank had an opportunity to submit a counteraffidavit from the other – from the loan officer at the bank and say everything that guy just said is a lie. And we never – that just never happened. We didn't talk about it. I didn't have an agreement with him. I never agreed to release or modify the guarantee or anything. That's correct. The bank didn't do that because the bank didn't feel that that was necessary because of the statute of frauds, because of the contract, and because a contract modification hadn't been met. And this brings us to the second prong of that contract modification, which is new consideration. Okay, so their point on consideration, which I asked them about as well, getting the $500,000 now constitutes consideration. And that's just not correct under Texas jurisprudence. The Dallas Court of Appeals in Arthur Gallagher v. Dietrich stated, a promise to fulfill a preexisting obligation in a contract cannot serve as new consideration for a modification of that contract. But he didn't have any obligation to pay the $500,000. There was no preexisting – his obligation was purely contingent, as I understand it. I mean, tell me if this is wrong. The way it looks is that if there's a default, then he's on the hook for all of it. But prior to a default, his obligation is zero. Well, respectfully, his obligation is coexistent with that promissory note. A default alone isn't triggered. And the obligation itself under that – under the commercial guarantee that he signed made him jointly and severally liable on the note with the other guarantor and the borrower. And so he had the obligation under this to pay the full balance along with the borrower. Now, in his affidavit, he states, well, I had this subjective belief that I owed 38% of this, and the other co-guarantor agreed with me, and so I offered this money to the bank. But that consideration that was paid is based on his already existing agreement with the bank. And so the payment of the $500,000 in and of itself is not new consideration because it's an existing obligation that already took place. So as a result, the bank asserts that there was no valid contract modification, and the trial court's judgment should be sustained. Now, the appellant has raised four separate issues on appeal that all relate to his affirmative defenses, and they're all based, again, on the same oral agreement. The court focused a little bit initially on the quasi-estoppel agreement. And quasi-estoppel is an equitable doctrine that says a party can't take a position differently than one they had taken previously to another party's detriment. In this case, outside of this inadmissible oral agreement, there is no evidence that was presented to the court that the bank had taken a position inconsistent with a prior position. Can we split two questions to make sure I understand the bank's position on both? It strikes me that one question is, is quasi-estoppel an exception to the statute of frauds? A second question is, assuming the answer to that is yes, is there sufficient evidence to trigger quasi-estoppel here? So I understand what you just said to answer the second question, but do you disagree that there are multiple Texas cases describing the doctrine of quasi-estoppel as an exception to the statute of frauds? No, I think that quasi-estoppel may be an exception to the statute of frauds, but the agreements that a party would rely on for quasi-estoppel have to be in writing within the statute of frauds. You can't have this oral agreement that a party is allegedly taking an inconsistent position and then overlay quasi-estoppel to try and mute out the statute of frauds. I don't think there's any question that the contracts and the statute of frauds require any modifications to these agreements to be in writing. So if the bank had taken a written – had done a written agreement with him, releasing him, and then filed this – then sought to file this claim to collect the money, he could have asserted this defense of quasi-estoppel. But I don't think that it can push aside the statute of frauds requirements. So – well, obviously, if they had done it in writing, there wouldn't have been a statute of frauds problem. That's correct. So is your answer to the first question, that is, is the doctrine of quasi-estoppel an exception to the statute of frauds, you would say no, it's not? I don't believe it is in this case. And so what do we do with the Texas cases that describe it as an exception? Do we just think that those are outweighed by other cases saying the opposite? Well, I think that the – what we have to look at are the cases that apply the statute of frauds. And in situations like this in which we have a lender where the loan agreement is required to be under the statute of frauds, the personal guarantee is required to be under the statute of frauds, and the documents themselves require this, then I think that the – those cases are segregated by the facts in this case. And so – What conceivable justification would Mr. Zeidman have? I realize you don't represent Mr. Zeidman. But from the outside looking in at the transaction, at the time he makes the $500,000 payment, he owes $0, right? Because the guarantee hasn't been triggered. The promissory note is the only thing that is in existence creating an obligation to pay. And he makes a $500,000 voluntary payment with no obligation to do it. Obviously, he's not giving a gift to the bank. He's presumably getting something in return for it. So what is the bank's position of what the bank was returning to him in exchange for the $500,000? What was the bank, you understand, for that consideration he provided? Yeah, I understand. So what counsel for Mr. Zeidman stated was that Mr. Zeidman is still an officer of the borrowing entity. So, again, this is pure speculation on my part, but it may be that the borrowing entity needed their monthly payments reduced, and so this capital infusion was made to reduce the monthly payments to make these payments affordable for the borrowing entity so it could continue to make those payments. And so the bank accepted that payment and then offered these reduced payment terms. But there's no evidence of that in the record other than the email, right? That's correct. That's correct. Appellant also asserts this affirmative defense of equitable estoppel. And the court correctly questioned what the detrimental reliance was on the representation. And the Texarkana Court of Appeals stated in Vessels v. Anschutz, to have detrimentally relied on an alleged misrepresentation, a defendant must have changed his position from a better position to a worse position. And in this case, that did not happen. Before this agreement occurred and before this payment was made, Mr. Zeidman was on the hook for the entire balance. He made the payment, and the bank is seeking the difference between the original balance of $1.3 million and the $500,000 that he paid. So his position hasn't changed. So he hasn't met his burden on the equitable estoppel defense. Mr. Zeidman also raises the defense of release. And as the Southern District of Texas stated in Vanderbilt Mortgage v. Flores, in order to establish the affirmative defense of release, the party asserting it must prove the elements of the contract. In this case, we don't have the elements of the contract established. There's no offer, acceptance, objective meeting of the minds, or new consideration that's paid. And I know that the appellant has cited this Dicker case in reliance on trying to prove this oral agreement between the bank to support his release claim. But as I've discussed, that case is distinguishable because there was no dispute that there were multiple discussions between the parties, and then there was subsequent conduct that happened. And that's not what we have in this case. And in the Dicker case, interestingly, it didn't address whether the documents themselves contain language that prohibit oral modifications to the agreements. So I just don't think that the Dicker case is on point for this particular set of facts. And frankly, the Dicker case appears to just be an outlier case in Texas jurisprudence. Most of the cases follow the Texas Supreme Court holding in Dracopolis, which states a party to a written contract that's within the provision of the statute of frauds may not by mere oral agreement alter one or more of the terms. And that is precisely what the appellant is trying to ask this court to do. Finally, appellant's last affirmative defense and point on appeal is the accord and satisfaction argument. To prove accord and satisfaction, Mr. Zeidman is required to show that there was a legitimate dispute about the underlying obligation. We don't have that in this case. In fact, his own affidavit confirms prior to his payment that he agreed that the balance was $1.3 million. So there's no evidence to support the idea that there was a dispute on the underlying transaction. What Mr. Zeidman appears to be saying is, look, there was this payment to the bank of $500,000, and the bank accepted this payment. Therefore, there must have been an agreement because it had no other reason to pay it. But as the El Paso Court of Appeals stated in Beza, the mere acceptance of a payment is not enough to establish accord and satisfaction. And the Dallas Court of Appeals stated, this is especially true where the payment was on account of a preexisting liquidated debt and where payment was unaccompanied by any restrictive endorsement or some other clear indication that the payee would consider the payment a release or satisfaction. And in the case before this court, none of those requirements have been established by Mr. Zeidman. We have a liquidated debt. It was a preexisting debt, and there was no restrictive covenant that accompanied his payment. When you say liquidated debt, you don't mean due and payable. What do you mean by liquidated? The liquidated debt was that the amount was not in dispute. The $1.3 million prior to his payment of $500,000 was not in dispute. But it wasn't actually a debt, right, because he didn't owe $1.3 million. Well, the agreement that he signed, the commercial guarantee agreement, bound him to be liable jointly and severally with the borrower in that amount. For these reasons, the bank asks the court to affirm the trial court's decision on all counts. Thank you. Thank you very much. Rebuttal. Your Honor, I'd like to spend a little time visiting about what the parole evidence is really doing and what it does and what the statute of frauds under Texas law is really doing because I think that's where a lot of this confusion is coming from. The parole evidence rule is an evidentiary rule that keeps in a trial, for instance, over a contract, it would keep one of the parties to the contract from introducing evidence outside of the four corners of the contract to say, oh, well, here's what everybody meant. If the contract is not ambiguous, then the contract has to be construed within the four corners. Do you agree that all the relevant contracts here, the loan, the guarantee, are subject to the statute of frauds? No. And the reason is. Okay. So that's different from. That's correct. So explain to me why. So the statute of frauds in Texas is in the Texas Business and Commerce Code under 26.01. 26.01B gives you a laundry list of exactly. What about a promise by one person to answer for the debt of another person? That's correct.  And so that's why the banks always have a written guarantee agreement. And that's why in this case there is a written guarantee agreement. But what. It's not subject to the statute of frauds. No. The guarantee agreement is. I'm sorry, Your Honor. I might be getting this confused. The guarantee agreement is subject. A guarantee is subject to the statute of frauds. A subsequent agreement for a payment or a release is not subject to the statute of frauds. Because under 26.01B6, that. All of the other items in the laundry list under 26.01 have nothing to do with this subsequent agreement. Except 26.01B6, which says an agreement that is not performable within one year. This subsequent agreement by Mr. Zyman and the bank for Mr. Zyman to pay $500,000 to get a release was clearly performable within one year, which takes it outside of the statute of frauds. And so, of course, a written guarantee agreement. And, by the way, I think that's an excellent reason. It's an excellent. Not a reason, but it evidences why banks have written provisions in the guarantee agreement that say a subsequent modification of this agreement must be in writing. Because under the statute of frauds, a guarantee agreement must be in writing. So if you're only trying to change the language or to change the guarantee agreement, it's subject to the statute of frauds, and that would have to be in writing. But if you're doing a subsequent agreement that changes the payment terms or that gives you a release or that changes where you make the payments, that's something that's not subject to the guarantee agreement. That's a subsequent agreement that is collateral. The courts call it collateral to the guarantee. And I would like to point out that in the Warriors Constructors case, that's an interesting case as well. The Warriors Constructors case was out of the Houston 14th Court of Appeals. And in that case, it was tried to the court. It's not a summary judgment case. But that case involved a limited guarantee where the guarantor only agreed to guarantee a portion of the overall debt. And in that case, the guarantor sent in a payment, not the maker of the obligation, but the guarantor sends in a payment and sends it in with a letter and said, I want to make sure that this payment is credited to my limited guarantee. And the creditor came back and took issue with that and said, well, you know, we're not sure we're going to allow that. But they took the check and they accepted the check. And then subsequent to that, the guarantor sent additional checks with additional letters just like that, saying I want this applied to my limited guarantee agreement. The bank did not take any issue. Those checks were accepted and they were taken and they were cleared. And at trial, the bank said or the creditor said, no, wait, we didn't agree to accept those, and so we're not going to apply those to your limited guarantee. And the court said sending the check was the offer, keeping the check was acceptance, and because the guarantor had no obligation to pay at that time, that's sufficient for consideration for the subsequent agreement as to payment. What case are you talking about again? That's the Warriors Constructors, Inc. case. It's a Houston 14th Court case, and the site on that is 536 Southwest 2nd, 382. We did cite that in appellant's brief. And so the court made the point that whether a modification of a guarantee or a separate agreement, it's sufficient to bind the bank. And so although that's not a release case, it's a case where the court said, yes, a guarantor can change by a subsequent agreement the payment terms of the guarantee in order to get credit against its limited guarantee because it didn't owe that guarantee at the time. The objective of the number of conversations is irrelevant to statute of frauds. Well, that's all right. Well, thank you for your argument. Thank you. Appreciate the argument on both sides. The case is submitted, and we are adjourned.